**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **HELENA GRAHAM,**<br>**Plaintiff,**<br><br>**v.**<br><br>**PHH MORTGAGE CORPORATION, AMERICAN SECURITY INSURANCE COMPANY, ASSURANT INC., AND NEWREZ LLC,**<br><br>**Defendants.** | **CIVIL ACTION**<br><br>**NO. 25CV432** |

**MEMORANDUM OPINION**

More than twenty years ago, Plaintiff Helena Graham purchased her home with the help of a mortgage. The mortgage required her to keep hazard insurance on the property and provided that, if she failed to do so, the lender could obtain insurance for the property and charge her for it. After Graham's own insurance coverage lapsed, hazard insurance was placed on the property at her expense. Following that placement, Graham brought this suit on behalf of herself and a putative class of similarly situated homeowners, contending that the way in which that insurance was obtained and charged to her violated federal and state law, including the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601-2617 ("RESPA"), Pennsylvania's Fair Credit Extension Uniformity Act, 73 P.S. § 2270.1 *et seq.* ("FCEUA"), and Pennsylvania contract law.

The Defendants—American Security Insurance Company ("ASIC"), Assurant, Inc.

("Assurant"), PHH Mortgage Corporation ("PHH") [1], and NewRez, LLC ("NewRez")—each allegedly played some role in the insurance placement process. The precise role each Defendant played, and whether that role subjects it to liability, is disputed and described in greater detail below.

Defendants previously moved to dismiss Graham's claims under Federal Rule of Civil Procedure 12(b)(6), and the Court granted those motions in part and denied them in part. *See Graham v. PHH Mortg. Corp.*, 2026 WL 899427 (E.D. Pa. Mar. 30, 2026). Graham then filed a Third Amended Complaint, in which she again asserts claims against all Defendants under RESPA § 2605 and the FCEUA, as well as a breach-of-contract claim against PHH.

The Court now considers a second round of motions to dismiss, this time directed at Graham's amended allegations. Assurant moves under Federal Rule of Civil Procedure 12(b)(2) to dismiss Graham's claims against it for lack of personal jurisdiction, Fed. R. Civ. P. 12(b)(2), and all Defendants move under Federal Rule of Civil Procedure 12(b)(6) to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6). For the reasons that follow, Defendants' Motions shall be granted in part and denied in part.

## I. FACTUAL BACKGROUND

Plaintiff Helena Graham secured a mortgage to purchase her home. The mortgage agreement, executed between Graham and Argent Mortgage Company,[2] requires her to maintain adequate and continuous hazard insurance on the property. If she fails to do so it authorizes the lender to obtain insurance and charge her for the cost. It also provides for an escrow account

[1] PHH is now known as Onity Mortgage Corporation. For consistency, however, the Court will continue to refer to it as "PHH" throughout this Opinion.

[2] The Third Amended Complaint does not clearly identify the lender on Graham's original mortgage. The mortgage currently encumbering the property, however, was executed between Graham and Argent Mortgage Company.

through which portions of Graham's monthly mortgage payments may be applied to hazard-insurance premiums.

Graham alleges that the mortgage was transferred to Ocwen Loan Servicing, and that, after Ocwen acquired PHH, her loan was "transferred to PHH for servicing." In its capacity as servicer, PHH allegedly "exercised authority to purchase lender-placed hazard insurance for properties it considered uninsured" and carried out that authority through relationships with vendors, including ASIC and Assurant, ASIC's parent company (together the "Assurant Defendants"). Also, according to the Third Amended Complaint, PHH operated together with NewRez in a "servicing structure" under which PHH performed servicing functions on NewRez's servicing platform, while NewRez served as the borrower-facing entity through which communications, statements, account information, and online-portal notices were transmitted and maintained.

From January 2022 through April 2023, Graham maintained her own hazard insurance policy through ASIC. In April 2023, she obtained a new hazard insurance policy through Openly, Inc. The events giving rise to this action began later that year. According to Graham, despite the Openly policy being in effect, her monthly mortgage statements beginning in October 2023 reflected charges associated with an ASIC hazard-insurance policy (the "Refunded Insurance Placement"). Graham alleges that PHH, acting through the NewRez servicing platform, imposed those charges without first requesting proof of insurance or advising her that lender-placed coverage would be obtained. Three months later, however, her mortgage statement reflected an "Insurance Refund" reversing the full amount previously charged for the overlapping ASIC coverage. Graham alleges that Defendants never separately acknowledged or explained either the placement or the refund.

Meanwhile, in later December 2023, Defendants uploaded a letter to Graham's online servicing portal. Graham was enrolled in Defendants' "paperless" program such that loan communications were to be delivered through the portal. The letter, issued on NewRez letterhead identifying "c/o PHH Mortgage Services" and originating from PHH's "Insurance Department," stated that Defendants had been advised that Graham's Openly policy had been cancelled and was set to expire in several months. Under the heading "What Needs to Be Done?," the letter advised Graham that PHH required "a copy of [her] insurance renewal declaration page on an annual basis" and instructed her to provide a reinstatement notice or new policy by mail, email, or through the designated insurance website. Graham's Openly policy expired on March 28, 2024. She did not obtain replacement coverage immediately, and her property therefore went uninsured.

Several months later, on July 12, 2024, while no hazard insurance covered the property, Defendants procured a force-placed insurance policy through ASIC, effective retroactively from the date the Openly policy expired (the "Unrefunded Insurance Placement"). Graham alleges that she was notified of this placement by a letter mailed on or about July 18, 2024, rather than through the online portal. Indeed, the July 18 letter was never posted to her borrower portal.

That letter advised her that force-placed coverage had been obtained pursuant to the mortgage documents, that the premium had been billed to escrow, and that Defendants would cancel the policy upon receipt of proof of acceptable insurance, with any unused premium refunded. The letter also "strongly urge[d]" Graham "to contact an insurance agent and/or company of [her] choice to purchase coverage," and further cautioned that the coverage insured only the structure of the house, did not protect personal property or provide liability coverage, and may carry significantly higher premiums because the carrier had issued the policy without

the benefit of normal underwriting guidelines. The lender-placed policy remained in effect until Graham obtained new hazard-insurance coverage through the Insurance Placement Facility of Pennsylvania in early January 2025.

## II. DISCUSSION

### A. Lack of Personal Jurisdiction[3]

Assurant moves under Federal Rule of Civil Procedure 12(b)(2) to dismiss Graham's claims against it for "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2). "Once challenged, the plaintiff bears the burden of establishing personal jurisdiction," a threshold issue that must be resolved before the Court reaches the merits. *O'Connor v. Sandy Lane Hotel Co*., 496 F.3d 312, 316 (3d Cir. 2007); *Small v. Camden Cnty*., 728 F.3d 265, 270 (3d Cir. 2013). Accordingly, Graham must demonstrate with "reasonable particularity" that sufficient contacts exist between Assurant and the forum state. *See Provident Nat. Bank v. California Fed. Sav. & Loan Assoc*., 819 F.2d 434, 437 (3d Cir. 1987).

"Under Federal Rule of Civil Procedure 4(e), a federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state." *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 155

[3] Graham argues that Assurant waived its personal jurisdiction defense by failing to raise it in its first motion to dismiss. *See Myers v. Am. Dental Ass'n*, 695 F.2d 716, 720 (3d Cir. 1982) ("If a party files a pre-answer motion but fails to raise one of the defenses enumerated above [including lack of personal jurisdiction], the party waives the omitted defense and cannot subsequently raise it in his answer or otherwise."). But Assurant's present Pennsylvania-specific jurisdictional defense did not arise in the same posture when it filed its earlier motion because the then-operative complaint asserted a civil RICO claim, for which Congress authorized nationwide service of process. See 18 U.S.C. § 1965(b); *Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 120 (3d Cir. 2020) ("When a civil RICO action is brought in a district court where personal jurisdiction can be established over at least one defendant, summonses can be served nationwide on other defendants if required by the ends of justice."). Where the statutory requirements for nationwide service are satisfied, "such service establishes personal jurisdiction, provided that the federal court's exercise of jurisdiction comports with Fifth Amendment due process." *Id*. at 122 (quoting *Cory v. Aztec Steel Bldg., Inc*., 468 F.3d 1226, 1229 (10th Cir. 2006)). Thus, while the RICO claim remained operative, Assurant's amenability to suit did not turn on whether it possessed sufficient contacts with Pennsylvania. Only after that claim was dismissed did Assurant's Pennsylvania contacts become independently dispositive of personal jurisdiction.

(3d Cir. 2010). The question of personal jurisdiction depends on: (1) whether there is "a statutory basis for exercising jurisdiction over the nonresident defendant in accordance with the law of the forum state"; and (2) whether the exercise of jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment. *Id*. (citing *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009)). Because Pennsylvania's long-arm statute authorizes personal jurisdiction over nonresidents to the "fullest extent allowed under the Constitution of the United States," 42 Pa. C.S. § 5322(b), the two inquiries merge into one. *See Mellon Bank v. Farino*, 960 F.2d 1217, 1221 (3d Cir. 1992).

With that in mind, the Due Process Clause allows for two types of personal jurisdiction: general and specific. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413-15 (1984). "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)). Graham's complaint, however, relies on specific jurisdiction. Specific jurisdiction exists where the defendant "purposefully directed" its activities at the forum, the litigation "arise[s] out of or relate[s] to" at least one of those activities, and the exercise of jurisdiction comports with "fair play and substantial justice." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007) (internal quotation marks and citations omitted).

Assurant contends that the Third Amended Complaint "does not identify a suit-related connection Assurant has with Pennsylvania, much less a substantial connection." It characterizes itself as a holding company, rather than an insurance company, "with limited direct operations of

its own." Relying on its interrogatory responses, Assurant maintains that it has no employees, does not collect premiums or other charges for lender-placed insurance, does not contract with mortgage lenders or servicers for the placement of such insurance, and does not supervise ASIC's lender-placed-insurance operations or maintain a reporting structure for those operations.

Graham offers two theories in response. First, she contends that Assurant itself participated in the lender-placed-insurance process through Assurant Specialty Property ("ASP"). Second, she argues that the Pennsylvania contacts of Assurant's subsidiary, ASIC, may be attributed to Assurant under an alter-ego theory.

As to the first theory, Graham points to PHH's written Lender Placed Insurance Policy, which states that "PHH Mortgage fully outsources insurance services to Assurant Specialty Property ("ASP"), a third-party vendor" and "uses ASP to issue LPI policies, as necessary, on properties securing mortgage loans serviced by PHH Mortgage." That document may establish ASP's role in PHH's lender-placed-insurance program, but it does not establish that ASP's conduct is attributable to Assurant. Indeed, the Third Amended Complaint does not allege that ASP is a division of Assurant. It alleges only that Assurant "conducts and organizes lender-placed insurance operations through its affiliated insurance-services structure, including Assurant Specialty Property and related entities"—a formulation that leaves ASP's precise corporate relationship to Assurant unspecified.

Graham attempts to fill that gap with a 2013 Consent Order issued by the New York Department of Financial Services, which, at that time, described ASP as "a division of Assurant." *See* Consent Order ¶ 1, *In re Am. Sec. Ins. Co., Am. Bankers Ins. Co. of Fla., & Assurant, Inc.* (N.Y. Dep't of Fin. Servs. Mar. 21, 2013). But that more-than-decade-old description does not establish ASP's corporate status during the events giving rise to this action

in 2023 and 2024. Corporate structures can change, and Graham identifies no contemporaneous allegation or evidence showing that ASP remained a division of Assurant when the lender-placed insurance at issue here was administered.

Graham separately attempts to impute ASIC's contacts to Assurant under an alter-ego theory. That argument fares no better. According to Graham, ASIC performed the "functional steps" associated with implementing the lender-placed insurance policy on Graham's property. The Third Amended Complaint alleges that ASIC provided or maintained the systems and data used to generate and track policies, including information concerning effective dates, policy numbers, coverage limits, and premium amounts. It further alleges that ASIC had authority to determine or approve premiums and participated in agreements governing payment of lender-placed-insurance premiums.

"The alter ego theory permits a court to impute the in-forum contacts of one corporate entity to another, related corporate entity where the plaintiff can 'demonstrate that the out-of-forum corporation either controls or is controlled by an in-forum affiliate to such a degree that the two corporations operate as a single, amalgamated entity.'" *Katz v. DNC Servs. Corp.*, 2017 WL 5885672, at *4 (E.D. Pa. Nov. 29, 2017) (quoting *In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp.2d 580, 596 (M.D. Pa. 2009)). "[T]he alter ego theory . . . instructs that, if a subsidiary is merely the agent of a parent corporation, or if the parent corporation otherwise controls the subsidiary, then personal jurisdiction exists over the parent whenever personal jurisdiction (whether general or specific) exists over the subsidiary." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 781 (3d Cir. 2018) (internal citations and quotation marks omitted).

To establish alter ego status, a plaintiff "must essentially demonstrate that in all aspects of the business, the two corporations actually functioned as a single entity and should be treated

as such." *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 365-66 (3d Cir. 2018). Thus, "'[u]nder the alter ego theory of jurisdiction, a court may exercise personal jurisdiction over the parent based on the subsidiary's connection to the forum if the plaintiff can show that the parent controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent.'" *Riad v. Porsche Cars N. Am., Inc.*, 657 F. Supp.3d 695, 701 (E.D. Pa. 2023) (quoting *Radian Guar. Inc. v. Bolen*, 18 F. Supp.3d 635, 648 (E.D. Pa. 2014).

The evidence Graham identifies falls short of that demanding standard. She first relies on a 2016 Ocwen Loan Servicing Master Service Agreement that assigned ASIC and other insurance companies various operational responsibilities concerning insurance documents, customer communications, and borrower notices, including "generat[ing] customer notifications based on the servicer's instructions" and "coordinat[ing] with servicer correspondence personnel to ensure accurate and up to date borrower letters were being sent." But, by Graham's own acknowledgment, the agreement does not identify Assurant as a contracting party. Moreover, the agreement expired in 2021, before the conduct alleged in this action. Graham nevertheless seeks to connect Assurant to the agreement because the business and notice contact used an "@assurant.com" email address and because the agreement was signed on the insurers' behalf by John Frobose, who was also publicly identified as a senior Assurant executive.

Neither fact establishes the degree of domination necessary for alter ego jurisdiction. The use of a common email domain among members of a corporate family does not establish that the parent exercises abnormal control over its subsidiaries. *See DeBar v. FirstEnergy Corp.*, 2025 WL 1241903, at *7 (E.D. Pa. Apr. 29, 2025) (explaining that use of the same email domain by employees of a parent and its subsidiaries does not demonstrate the parent's domination of the

subsidiaries); *Rice v. First Energy Corp.*, 339 F. Supp.3d 523, 538 n.9 (W.D. Pa. 2018) ("[T]he use of same email address, i.e., '@firstenergycorp.com' by the employees of the parent corporation and its subsidiaries does not show that FEC exercises greater than normal control over its subsidiaries" such that a court may pierce the corporate veil). Nor does overlap in corporate management carry Graham far. "[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary," and such overlap "may not serve to expose the parent corporation to liability for its subsidiary's acts." *United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (internal quotation marks and citations omitted).

At its core, Graham's alter ego theory rests principally on Assurant's ownership of ASIC, some overlap in management, shared branding and email infrastructure, and the economic relationship among members of the Assurant corporate family. This does not establish a basis for attributing ASIC's Pennsylvania contacts to Assurant under an alter-ego theory. *See*, *e.g.*, *Kovalev v. Lidl US, LLC*, 647 F. Supp.3d 319, 339–40 (E.D. Pa. 2022) ("[T]he following are not sufficient to establish personal jurisdiction over the nonresident, parent corporation: (1) a parent's ownership of a subsidiary; (2) a shared name among the entities; (3) occupying the same office space; (4) issuing a unified marketing image; or (5) maintaining a company website noting that the companies consider[ ] themselves a single team or group.") (internal quotation marks omitted).

Graham therefore has not established with reasonable particularity sufficient suit-related contacts between Assurant and Pennsylvania, either directly or through an alter-ego theory. Assurant's motion to dismiss for lack of personal jurisdiction will accordingly be granted. [4]

---

[4] Graham alternatively requests jurisdictional discovery. Jurisdictional discovery is appropriate under certain circumstances at the Court's discretion, *Doe v. Hesketh*, 15 F. Supp.3d 586, 601 (E.D. Pa. 2014) (citing *Mass. Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997)), to wit: where a "plaintiff presents

**B. Failure to State a Claim**

Defendants also move under Federal Rule of Civil Procedure 12(b)(6) to dismiss each of Graham's claims made against them for failure to state a claim. To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Threadbare" recitations of the elements of a claim supported only by "conclusory statements" do not suffice. Id. Rather, a plaintiff must allege some facts to raise the allegation above the level of mere speculation. *Great W. Mining & Min. Co. v. Fox Rothschild, LLP*, 615 F.3d 159, 176 (3d Cir. 2010) (citing *Twombly*, 550 U.S. at 555).

In evaluating a motion to dismiss, the complaint must be construed "in the light most favorable to the plaintiff," with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). Legal conclusions are disregarded, well-pleaded facts are taken as true, and a determination is made as to whether those facts state a "plausible claim for

---

factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum state,'" *Toys "R" Us*, 318 F.3d at 456-58 (internal citations omitted) or "[w]here the plaintiff's claim is not clearly frivolous[.]" *Compagnie Des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir. 1983). Here, however, Graham has not identified allegations or evidence suggesting the possible existence of additional suit-related contacts between Assurant and Pennsylvania. Additionally, discovery has been ongoing for months, and Graham has already obtained and relied upon corporate agreements, interrogatory responses, and other materials bearing on the relationships among the relevant entities. Yet those materials still do not identify a factual basis for exercising jurisdiction over Assurant. *Cf. Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C. Cir.1983) (holding that it is not an abuse of discretion for a court to deny a request for additional jurisdictional discovery where the party has already had "ample opportunity" to conduct discovery). Graham's request for jurisdictional discovery therefore will be denied.

relief." *Id*. at 210-11.

A complaint must also be dismissed where, as a matter of law, "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). Thus, dismissal under Rule 12(b)(6) is appropriate where the complaint is barred by a dispositive issue of law.

"In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Documents "integral to or explicitly relied upon in the complaint" may also be considered without converting a motion to dismiss into one for summary judgment. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted and emphasis removed).

### C. Discussion

#### *i. RESPA*

Graham argues that Defendants violated 12 U.S.C. § 2605(k)(1)(A), which prohibits a servicer from obtaining force-placed insurance unless it has a "reasonable basis to believe the borrower has failed to comply with the loan contract's requirements to maintain property insurance." Section 2605(l), in turn, provides that a servicer shall not be deemed to have such a reasonable basis unless the requirements of that subsection have been satisfied. 12 U.S.C. § 2605(l). Those requirements include certain borrower-notice obligations, which Regulation X, 12 C.F.R. § 1024.37(c) and (d) implement. Graham therefore contends that Defendants' alleged failure to comply with the notice requirements of RESPA Section 2605(l) and Regulation X,

Section 1024.37(c) and (d) in connection with the Unrefunded Insurance Placement constitutes a violation of RESPA Section 2605(k)(1)(A). She seeks relief under Section 2605(f), which provides a private right of action for violations of Section 2605. *See* 12 U.S.C. § 2605(f); *see also Conway v. U.S. Bank, Nat'l Ass'n*, 2019 WL 936649, at *4 (E.D. Pa. Feb. 22, 2019) ("RESPA allows for a private right action under Section 2605 which governs mortgage servicing and escrow administration.").

a. Claim Against ASIC[5]

When Graham asserted her Section 2605 claim against ASIC in previous versions of her complaint, the Court dismissed it, without prejudice, because "only servicers may be 'liable to the borrower' for such failures under 12 U.S.C. § 2605(f)." *Graham*, 2026 WL 899427, at *7. As then pleaded, Graham did not allege that ASIC was a servicer within the meaning of RESPA; instead, she sought to hold it liable as a "participant[] in allegedly unlawful servicing conduct undertaken by PHH and NewRez." *Id.*

The Third Amended Complaint attempts to cure that deficiency. Graham now alleges that ASIC was "delegated and clothed with apparent authority to perform critical lender-placed insurance functions within the servicing process and knowingly participated in the coordinated notice, communication, placement, policy administration, and charging conduct through which the notice-deficient force-placement process alleged herein was carried out." ASIC responds that these additional allegations still does not make it a "servicer" within the meaning of Section 2605. As it puts it, "[a] servicer is not any person who happens to provide services to the servicer unrelated to the receipt and distribution of borrowers' scheduled periodic payments,"

[5] Graham asserts this claim against both Assurant Defendants. Because the Court lacks personal jurisdiction over Assurant, however, the analysis that follows addresses only ASIC.

and the Third Amended Complaint does not allege that ASIC handled Graham's periodic mortgage payments pursuant to the terms of her loan.

RESPA defines a "servicer" as the "person responsible for servicing of a loan." 12 U.S.C. § 2605(i)(2); *see also* 12 C.F.R. § 1024.2 ("*Servicer* means a person responsible for the servicing of a federally related mortgage loan."). "Servicing," in turn, means "receiving any scheduled periodic payments from a borrower pursuant to the terms of [the] loan" and "making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(3); 12 C.F.R. § 1024.2 ("*Servicing* means receiving any scheduled periodic payments from a borrower pursuant to the terms of any federally related mortgage loan . . . and making the payments to the owner of the loan or other third parties of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the mortgage servicing loan documents or servicing contract."). The Third Circuit has held that this statutory language "defining a servicer is controlling," and, on that basis, has rejected Section 2605 claims against entities that do not satisfy the definition. *See Jones v. ABN Amro Mortg. Grp., Inc.*, 606 F.3d 119, 125 (3d Cir. 2010).

To be sure, *Jones* left open the possibility that "there may [ ] be an instance in which the actions of the original lender clothe another with apparent authority as a 'servicer.'" *Id.* at 125 n.4. That reservation does not, however, dispense with Section 2605(i)'s statutory definition. Whatever the precise contours of the apparent-authority theory contemplated by *Jones*, nothing in the decision suggests that authority to perform a discrete regulatory obligation imposed on a servicer is, by itself, sufficient to make the entity performing that task a "servicer."

Graham nevertheless invokes that reservation here. The Third Amended Complaint

alleges that ASIC was "delegated and clothed with apparent authority to perform critical *lender-placed insurance functions* within the servicing process," including notice, communication, placement, policy-administration, and charging functions. (Emphasis added). In substance, Graham contends that because PHH delegated responsibility to ASIC for carrying out certain force-placed-insurance functions governed by Section 2605(l) and 12 C.F.R. § 1024.37(c) and (d), ASIC thereby assumed the status of servicer.

That reasoning conflates who a servicer is with what a servicer must do. As the Fourth Circuit, albeit in a nonbinding decision, aptly explained, "subsection (i)(3) identifies *what* servicing is. And subsection (i)(2) describes *who* a servicer is. But subsection (g) governs what a servicer *must do*." *Harrell v. Freedom Mortg. Corp.*, 976 F.3d 434, 442 (4th Cir. 2020). Although *Harrell* concerned § 2605(g), which governs the administration of escrow accounts, that same distinction applies to Section 2605(l). Section 2605(l) prescribes notices a servicer must provide before imposing force-placed insurance; it does not expand the definition of "servicer" to encompass every entity retained to carry out those notice obligations. Put differently, an entity does not become a servicer merely because the servicer delegates to it the operational task of sending a notice that RESPA requires the servicer to provide.

*Jones* reinforces that conclusion. There, entities actually received borrowers' funds and forwarded payments associated with the mortgage loans—conduct far closer to the statutory definition of "servicing" than generating or delivering lender-placed-insurance notices. *Jones*, 606 F.3d at 125. Yet the Third Circuit held that those entities were not servicers because they were not "responsible for" making the payments required under the lenders' loans. *Id*. If the physical receipt and forwarding of mortgage payments did not, standing alone, transform the intermediaries in *Jones* into statutory servicers, ASIC's performance of functions still further

removed from Section 2605(i)(3)'s definition—insurance tracking, notice preparation, placement, and policy administration—does not plausibly establish that they were responsible for servicing Graham's loan.

Regulation X, promulgated by the Consumer Financial Protection Bureau (the "CFPB"), points in the same direction. It distinguishes a "servicer" from a "service provider," defining the latter as "any party retained by a servicer that interacts with a borrower or provides a service to the servicer for which a borrower may incur a fee." 12 C.F.R. § 1024.31. Section 1024.37, which implements RESPA Section 2605(l)'s force-placed-insurance requirements, likewise preserves that distinction. When promulgating Regulation X, Section 1024.37(d)(4), the CFPB expressly contemplated the very arrangement alleged here, recognizing that "some servicers use third-party service providers to prepare force-placed insurance notices." *See* Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 FR 10696, 10,739-40. Yet Section 1024.37 continues to impose its notice obligations on the "servicer," not on the third-party service provider that may prepare or transmit the notice. The regulatory scheme thus contemplates that a servicer may outsource the performance of force-placed-insurance notice functions without thereby transforming the vendor performing those functions into the statutory servicer.

Graham's own allegations identify PHH—not ASIC—as the entity responsible for servicing her mortgage loan. ASIC's alleged participation in insurance tracking, notice preparation, placement, and policy administration may therefore bear on whether PHH satisfied the obligations imposed upon it as servicer. *See Christiana Tr. v. Riddle*, 911 F.3d 799, 806 (5th Cir. 2018) ("Congress could have imposed [Section] 2605 liability on 'whoever fails to comply or whoever has hired an agent who fails to comply.' It could have imposed liability on 'whoever

would be liable under traditional principles of tort law.' It could have said nothing at all, perhaps leaving the common law as a gap filler. It could have imposed the statutory duty to ensure compliance with the CFPB's regulations not only on loan servicers, but also on lenders. But Congress did none of those things."). But those allegations do not plausibly establish that ASIC itself was "the [entity] responsible for servicing" Graham's loan within the meaning of RESPA Section 2605(i)(2). Accordingly, Graham again fails to state a claim against ASIC under Section 2605.

b. Claim Against PHH

PHH argues that Graham's Section 2605 claim must be dismissed as to it as well because she has failed to adequately plead damages. A plaintiff asserting a violation of Section 2605 must do more than allege a breach of a statutory duty; the plaintiff "'must sufficiently allege one of two types of damages: (1) actual damages to the borrower as a result of the failure to comply with [Section] 2605; or (2) statutory damages in the case of a pattern or practice of noncompliance with the requirements of [Section] 2605.'" *Byrd Est. v. Nationstar Mortg., LLC*, 2025 WL 3172843, at *3 (E.D. Pa. Nov. 13, 2025) (quoting *Giordano v. MGC Mortgage, Inc.*, 160 F. Supp.3d 778, 781 (D.N.J. 2016)). PHH contends that the Third Amended Complaint adequately pleads neither.

*1. Actual Damages*

PHH first argues that Graham fails to "plead facts demonstrating a causal link between the alleged violations and alleged damages." Specifically, it contends that Graham's "own allegations negate any contention that the content or manner of delivery of any RESPA LPI notice caused" the force placement from which her alleged damages arose. To recover actual damages under RESPA, a plaintiff must "allege [] specific damage[s] suffered by [p]laintiff 'as the result of the alleged RESPA violations,'" thereby establishing "'a causal link between the

alleged violations and the alleged damages.'" *Jones v. Select Portfolio Servicing, Inc.*, 2008 WL 1820935, at *9-10 (E.D. Pa. Apr. 22, 2008) (quoting *Jones v. ABN AMRO Mortgage Group, Inc.*, 2008 WL 1722295, at *6 n.9 (E.D. Pa. Apr. 10, 2008)); *see also* 12 U.S.C. § 2605(f).

This is not the first time PHH has made that argument. In resolving PHH's prior motion to dismiss, the Court rejected it, *Graham*, 2026 WL 899427, at *9, explaining that 12 U.S.C. § 2605(f) requires actual damages to result from the RESPA violation and that, as pleaded, the "alleged violation is the unlawful imposition of force-placed insurance and the assessment of premiums, not simply the antecedent notice defect viewed in isolation." *Id*. Graham therefore was not required to allege that "the conduct underlying the assessment of premiums—namely, the deficient notices themselves—independently caused her damages." Rather, "[s]he need only allege that the violation here, the allegedly unlawful assessment of force-placed insurance premiums, caused her damages." *Id*. Because Graham alleged that "the assessment of premiums itself caused her damages," the Court held that her allegations were sufficient. *Id*.

The Third Amended Complaint does not alter that theory of actual damages and the Court's prior ruling is the law of the case. The law-of-the-case doctrine "directs courts to refrain from re-deciding issues that were resolved earlier in the litigation." *Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997). As the Supreme Court has explained, "[a] court has the power to revisit prior decisions of its own . . . , although as a rule courts should be loathe to do so in the absence of extraordinary circumstances . . . ." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988). Such circumstances include: (1) the availability of "new evidence"; (2) a supervening change in the law; and, (3) the need to correct a clear error or prevent "manifest injustice." *Pub. Int.*, 123 F.3d at 116-17 (citations omitted).

PHH identifies no new evidence or intervening change in controlling law. Nor has it shown—although it maintains that the Court's decision is "out of step" with some other federal courts—that the Court's prior ruling was clearly erroneous or resulted in manifest injustice. In putting forward its contention, PHH principally relies on cases applying RESPA's causation requirement in contexts other than the force-placed-insurance provisions at issue here. *See*, *e.g.*, *Davis v. Deutsche Bank Nat'l Trust Co.*, 2017 WL 6336473 (E.D. Pa., Dec. 12, 2017); *Spencer v. Hutchens*, 471 F. Supp.2d 548 (M.D.N.C. 2006); *Ortiz v. NewRez LLC*, 729 F. Supp.3d 71 (D. Mass. 2024). It also relies on *Marrett v. Aroostook Cnty. Fed. Sav. & Loan*, an out-of-circuit decision observing that plaintiffs "would only be entitled to the actual damages caused by the inadequate notice." 2024 WL 4344713, at *8 (D. Me. Sept. 30, 2024). None of these cases, even if they were precedential—which they are not—bear on the Court's prior decision.

*2. Statutory Damages*

PHH also seeks dismissal of Graham's request for statutory damages. An individual borrower may recover statutory damages "in an amount not to exceed $2,000" if a defendant exhibits "a pattern or practice of noncompliance" with Section 2605. *See* 12 U.S.C. § 2605(f)(1)(B). To plausibly allege such a pattern or practice, "[t]he plaintiff must show that the alleged violations were the standard or routine way of operating for the allegedly non-compliant loan servicer." *Davis*, 2017 WL 6336473, at *7 (citing *McLean v. GMAC Mortg. Corp.*, 595 F. Supp.2d 1360, 1365 (S.D. Fla. 2009)). Conclusory allegations that a defendant has "a pattern and practice of violating RESPA with other customers," without "specific information or factual averments about these 'other customers' or the alleged violations," are insufficient. *See id.*

This Court previously dismissed, without prejudice, Graham's request for statutory damages because her allegation that the notices delivered to Graham "were part of Defendants' regular way of conducting business across their servicing portfolio, enabling the imposition of

inflated and unauthorized FPI charges on borrowers nationwide" was conclusory, and the two specific placements involving Graham—the Refunded and Unrefunded Insurance Placements—did not themselves plausibly establish a pattern or practice of noncompliance. *Graham*, 2026 WL 899427, at *9-10. The Third Amended Complaint adds allegations concerning the structure through which PHH administered lender-placed insurance. Graham alleges that PHH admitted that vendor-sent hazard-insurance notices sometimes used standardized templates and that the notices concerning her property were prepared pursuant to PHH's written Lender Placed Insurance Policy. From those allegations, Graham contends that PHH's lender-placed-insurance program operated through written policies, vendor-supported workflows, centralized servicing systems, borrower communications, escrow administration, and standardized notice practices.

Those allegations describe a standardized process, but they do not plausibly allege a standardized practice of violating RESPA. A uniform policy or workflow may establish that PHH handled lender-placed insurance in a consistent manner; it does not, without more, show that noncompliance with RESPA was itself standard or routine. As the court explained in *Davis* allegations of a pattern or practice are insufficient where plaintiffs "offer no specific information or factual averments about these 'other customers' or the alleged [RESPA] violations." *Davis*, 2017 WL 6336473, at *7. The Court finds *Davis*' reasoning persuasive. Thus, once again, the Court is left with only the two alleged violations arising from the Refunded and Unrefunded Insurance Placements and concludes, consistent with its prior ruling and *Davis*, that those two instances are insufficient to establish a pattern or practice. *See id*. (concluding that evidence that a servicer failed to respond to two of four letters was "insufficient to prove a pattern or practice of violations of RESPA").

The Third Amended Complaint therefore does not cure the deficiency identified in the prior ruling. Graham's request for statutory damages against PHH will again be dismissed

c. NewRez

NewRez also seeks dismissal of Graham's RESPA claim. It advances three grounds. First, it argues that the Third Amended Complaint does not plausibly allege that NewRez was a servicer of Graham's loan. Second, it adopts PHH's argument that Graham has failed to adequately plead causation and actual damages. Third, it argues that Graham has not plausibly alleged a "pattern or practice" sufficient to support statutory damages.

Unlike PHH, however, NewRez did not raise any of these arguments in its prior Rule 12 motion. That presents a different procedural question. The issue is not principally whether the Court should reconsider a legal issue previously decided as to NewRez; it is whether Rule 12 permits NewRez to raise, through a second Rule 12(b)(6) motion, defenses that were available but omitted from its first.

Federal Rule of Civil Procedure 12(g)(2) provides that, subject to the exceptions in Rules 12(h)(2) and (3), "a party that makes a motion under [Rule 12] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). The Rule thus embodies a "consolidation" requirement designed to prevent defendants from presenting Rule 12 objections piecemeal. *See Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 319-20 (3d Cir. 2015) (explaining that a defendant contravenes Rule 12(g)(2) by raising in a successive Rule 12(b)(6) motion an argument that could have been raised in its earlier motion); *Stansfield v. Summitquest Acad.*, 2006 WL 573795, at *2 (E.D. Pa. Mar. 9, 2006) (declining to consider defenses that "were available" when defendants filed an earlier motion to dismiss but were omitted from that

motion); *see also* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1384 (3d ed. 2025) ("Subdivision (g) contemplates the presentation of an omnibus pre-answer motion in which the defendant advances every available Rule 12 defense and objection he may have that is assertable by motion.").

Rule 12(h)(2) preserves a failure to state a claim defense notwithstanding its omission from an earlier Rule 12 motion, but it specifies how that preserved defense may later be raised: "in any pleading allowed or ordered under Rule 7(a)," "by a motion under Rule 12(c)," or "at trial." Fed. R. Civ. P. 12(h)(2). It does not authorize a successive Rule 12(b)(6) motion asserting an available defense omitted from an earlier one. *See Leyse*, 804 F.3d at 320-21 ("The procedural bar of Rule 12(g)(2), however, covers all motions to dismiss for failure to state a claim, regardless of the grounds asserted."). Thus, although NewRez has not forfeited its failure to state a claim defenses altogether, Rule 12(g)(2) restricts its ability to present them through the successive Rule 12(b)(6) motion now before the Court.

That said, Rule 12(g)(2) does not bar a renewed Rule 12(b)(6) challenge based on "new factual averments" in an amended complaint. *See Kroger Co. v. New Enter. Stone & Lime Co.*, 2018 WL 4615955, at *2 (E.D. Pa. Sept. 25, 2018). Here, however, NewRez's arguments rest on allegations that were present in the Second Amended Complaint and therefore were available when NewRez filed its first motion.

First, NewRez now argues that the Third Amended Complaint does not allege that it was the servicer of Graham's mortgage loan. But the allegations concerning that argument have not changed. The Second Amended Complaint alleged that PHH was "the servicer of [Graham's] mortgage loan" and that NewRez "works in conjunction with PHH to facilitate loan servicing operations." The Third Amended Complaint contains the same allegations and still does not

expressly allege that NewRez itself was the entity responsible for servicing Graham's loan. NewRez therefore could have raised its servicer-status argument in its earlier motion but did not. Rule 12(g)(2) precludes it from doing so now through another Rule 12(b)(6) motion.

NewRez now also seeks to adopt PHH's contention that Graham fails to allege a sufficient causal relationship between the asserted RESPA violation and her actual damages. But Graham's theory of actual damages has not changed since the Second Amended Complaint. The factual and legal basis for this challenge therefore existed when NewRez filed its prior motion. Having omitted the argument then, NewRez may not raise it now in its Rule 12(b)(6) motion.

Finally, NewRez argues that Graham has failed to allege a "pattern or practice" sufficient to recover statutory damages. The Third Amended Complaint does add allegations concerning PHH's written policies, standardized templates, and vendor-supported lender-placed-insurance process. But Graham's basic theory—that the challenged conduct reflected Defendants' standardized manner of conducting their lender-placed-insurance business—was already present in the Second Amended Complaint, which alleged that the notices sent to Graham were "part of Defendants' regular way of conducting business across their servicing portfolio." NewRez therefore could have challenged the sufficiency of Graham's pattern-or-practice allegations in its first motion to dismiss, but chose not to.

Accordingly, Rule 12(g)(2) bars NewRez from presenting these previously available grounds for dismissal through a successive Rule 12(b)(6) motion. That conclusion does not mean the defenses themselves have been forfeited. *See* Fed. R. Civ. P. 12(h)(2). It means only that NewRez may not assert them through the Rule 12(b)(6) motion presently before the Court.

***ii. UTPCPL/FCEUA***

Graham also alleges that Defendants violated the FCEUA, which prohibits debt collectors

and creditors from engaging in unfair or deceptive acts or practices in connection with debt collection. *See* 73 P.S. § 2270.4. The Court previously dismissed, without prejudice, Graham's FCEUA claims because she failed to plausibly allege either deceptive conduct or justifiable reliance. *See Graham*, 2026 WL 899427, at *14.

The FCEUA does not itself create a private right of action. *See Marshall v. Abdoun*, 2023 WL 2588166, at *10 (E.D. Pa. Mar. 20, 2023). Instead, "[i]f a debt collector or creditor engages in an unfair or deceptive debt collection act or practice under this act, it shall constitute a violation of the . . . Unfair Trade Practices and Consumer Protection Law." *See* 73 P.S. § 2270.5(a). Thus, a consumer seeking relief for an alleged FCEUA violation must proceed through the remedial provisions of the UTPCPL and must plead the elements necessary to state a claim under that statute. *See Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 182 (3d Cir. 2015), abrogated on other grounds by *Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466 (2019) ("If the FCEUA can only be enforced to the extent the UTPCPL's private remedy is invoked, then it follows that Kaymark cannot state a claim for relief under the FCEUA if he cannot state a claim for relief under the UTPCPL.").

The UTPCPL prohibits, among other things, "unfair or deceptive acts or practices." *See* 73 P.S. § 201-2(4); *Keller v. Volkswagen of Am., Inc.*, 733 A.2d 642, 646-47 (Pa. Super. 1999). Graham invokes the statute's catchall provision, which prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." *See* 73 P.S. § 201-2(4)(xxi). To state a claim under that provision, "a plaintiff must show that [s]he justifiably relied on the defendant's wrongful conduct or representation and that [s]he suffered harm as a result of that reliance." *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004) (citations omitted); *see also Hunt v. U.S. Tobacco Co.,* 538 F.3d 217, 222

n.4 (3d Cir. 2008) ("A justifiable-reliance requirement, by contrast, requires the plaintiff to go further [than a mere causal connection]—he must show that he justifiably bought the product in the first place (or engaged in some other detrimental activity) because of the misrepresentation.").

The Third Amended Complaint advances a different theory from the one the Court previously rejected. The Second Amended Complaint depended largely on the contention that Defendants' notices and imposition of lender-placed insurance were themselves confusing or misleading. The Third Amended Complaint instead focuses on Defendants' use of the online borrower portal. Graham alleges that Defendants "establish[ed], us[ed], and induc[ed] reliance upon the borrower portal as Plaintiff's ordinary channel for receiving material mortgage servicing communications," but then failed to post there the July 18, 2024 letter advising her that lender-placed insurance had actually been obtained and charged to her account.

According to Graham, by enrolling in paperless delivery she directed—and Defendants understood—that important servicing communications, including insurance notices and disclosures, would be delivered through the portal rather than by ordinary mail alone. She alleges that Defendants reinforced that expectation by regularly using the portal to communicate with her. Yet the July 18, 2024 letter, which she characterizes as "the clearest communication informing Plaintiff that lender placed hazard insurance had in fact been obtained," was never posted there. Graham contends that this omission concealed, through the very channel on which Defendants had encouraged her to rely, that lender-placed insurance had been imposed and that responsive action remained necessary to terminate, reduce, or contest the resulting charges. Had the July 18 letter been posted, she alleges, she would have acted sooner by obtaining replacement coverage, submitting proof of insurance, seeking cancellation of the lender-placed policy, or

otherwise challenging or mitigating the charges.

In substance, then, Graham's reliance theory is that she relied on the borrower portal as a complete source of material servicing communications; because the July 18 letter did not appear there, she did not learn promptly that lender-placed insurance had actually been imposed; and that delay deprived her of the opportunity to take earlier action to reduce or avoid the resulting charges.

Defendants argue that these allegations still do not plausibly establish justifiable reliance. They are correct. In *Chalal v. Wells Fargo Asset Sec. Corp.*, borrowers alleged that they detrimentally relied on a Wells Fargo representative's misrepresentations concerning a loan-modification program in the face of charges associated with lender-placed insurance. 2018 WL 11099082, at *1 (E.D. Pa. May 7, 2018). The court nevertheless held that their conclusory allegation of justifiable reliance was "undermined" by the express terms of their mortgage. *Id*. at *1 n.1. Among other things, the mortgage clearly advised them that "Lender may obtain insurance coverage, at Lender's option and Borrower's expense" and that the cost of such insurance "might significantly exceed the cost of insurance that Borrower could have obtained." *Id*. The court therefore concluded that reliance on contrary representations was "implausible because [the borrowers] were given notice of the financial responsibilities that underlie their UTPCPL claim." *Id*. The same problem exists here. Graham alleges that she knew she was contractually required to maintain hazard insurance. She also acknowledges receiving the December 21, 2023 communication advising her that her existing coverage was expected to expire on March 28, 2024 and instructing her to provide proof of continued coverage. Her Openly policy then expired on that date, and she did not immediately obtain replacement insurance. Thus, before the July 18 letter was ever sent, Graham knew both that her mortgage

required continuous hazard insurance and that the coverage then protecting the property was about to lapse. She also knew from the mortgage— and from prior instances in which Ocwen, her former mortgage servicer, had obtained lender-placed insurance after acceptable proof of coverage was not provided—that a failure to maintain coverage could result in lender-placed insurance at her expense.

Those allegations make it implausible that Graham justifiably relied on the absence of a July 18 letter from the online portal as an indication that no lender-placed insurance had been, or would be, imposed. The absence of a communication from one delivery channel did not contradict any affirmative representation that her property remained insured, that no lender-placed coverage would be obtained, or that no further action was required. Nor does the Third Amended Complaint allege that Defendants represented that every servicing communication would appear exclusively in the portal or that Graham could safely infer from the absence of a particular notice that no lender-placed insurance had been imposed.

Graham responds that this reasoning "conflates knowledge of a possible insurance lapse with knowledge that PHH would impose and bill a backdated LPI policy before satisfying required notice prerequisites, omit the clearest post-placement communication from the Portal, and present the resulting charge as a valid mortgage obligation through escrow and billing records." But that argument addresses whether Graham knew the precise manner in which Defendants would administer the force-placement process; it does not establish that she acted to her detriment in reliance on deceptive conduct by Defendants. *See Yocca*, 854 A.2d at 438. Her own allegations establish that she knew her insurance was expiring, knew she was required to maintain continuous coverage, and knew that lender-placed insurance could follow if she failed to do so.

The Court previously observed that Defendants' warning that lender-placed insurance would be purchased if Graham allowed her existing policy to lapse, their identification of the date on which that policy would lapse, and their subsequent urging that she obtain replacement coverage when lender-placed insurance was imposed could not reasonably be characterized as deceptive and therefore could not support a claim of justifiable reliance to her detriment. *Graham*, 2026 WL 899427, at *13. The Third Amended Complaint's new portal theory does not alter that conclusion.

Accordingly, Graham again fails to state a claim under the FCEUA as enforced through the UTPCPL.

***iii. Breach of Contract***

Graham claims that PHH's placement of hazard insurance on her property breached her underlying mortgage contract. The Third Amended Complaint alleges that Graham's mortgage required her to maintain hazard insurance on the property and, if she failed to do so, authorized the lender to "obtain insurance coverage at Plaintiff's expense in order to protect the lender's interest in the property." Graham further alleges that this "contractual force-placement remedy was not unlimited," but instead constituted a discretionary remedy that "could be exercised only for the purpose of protecting the lender's interest in the property, only to the extent reasonably necessary to do so, and only in a manner consistent with the mortgage's purpose and governing law."

According to Graham, after servicing of her loan was transferred, PHH "undertook and exercised the servicing responsibilities associated with Plaintiff's loan," including escrow administration, hazard-insurance tracking, force placement, and the assessment of insurance-related charges. She alleges that PHH determined whether lender-placed insurance would be

obtained, when it would be obtained, how resulting charges would be applied to her escrow account, and how the force-placement process would be administered. From those allegations, Graham concludes that, "[b]y undertaking and exercising the mortgage's force-placement remedy," PHH assumed the contractual duties and limitations accompanying that remedy, including an obligation to exercise its discretion in good faith and not in an "arbitrary, unreasonable, unnecessary, overlapping, unauthorized, or unlawfully administered manner."

The Court previously dismissed, without prejudice, Graham's breach of contract claim against PHH because Graham had not plausibly alleged contractual privity. *Graham*, 2026 WL 899427, at *12. As the Court explained, mortgage servicers ordinarily are not parties to borrowers' mortgage agreements, and Graham's agency theory likewise failed because the Second Amended Complaint did not allege that PHH had agreed to assume liability under the mortgage. *Id*. Although Graham has now amended her allegations, PHH again argues that she has not plausibly alleged contractual privity nor any theory of agency. PHH is correct.

Graham acknowledges that "every mortgage servicer [does not] automatically become[] liable for every obligation in a borrower's mortgage" and that "a defendant generally cannot be liable for breach of contract unless it is a party to the contract or has specifically assumed the relevant contractual obligation." She nevertheless describes her present theory as "narrower." She contends that PHH assumed the mortgage's contractual obligations by undertaking and exercising its force-placement remedy and administering the related escrow and insurance functions.

Pennsylvania agency law does not support that theory. Ordinarily, "an individual acting as an agent for a disclosed principal is not personally liable on a cont[r]act between the principal and a third party unless the agent specifically agrees to assume liability." *Bret Binder v.*

*Weststar Mortg., Inc.*, 2016 WL 3762710, at *19 n.9 (E.D. Pa. July 13, 2016) (citing *Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145, 150 (Pa. Super. 2012)). *Bennett* recognizes that an agent may nevertheless assume personal liability where the agent "executes a contract in his own name or voluntarily undertakes a personal responsibility." 40 A.3d at 150.

But *Bennett* does not stand for the proposition that an agent assumes personal contractual liability merely by performing duties delegated to it under the principal's contract. There, the individual defendant personally guaranteed the quality of the completed home and made representations that reasonably led the homeowners to believe that he himself would ensure proper performance. *Id.* The court therefore concluded that he had "voluntarily assumed personal liability on the building contract." *Id.*

No comparable allegation appears here. Graham does not allege that PHH executed the mortgage in its own name, expressly guaranteed performance of any obligation under it, or otherwise represented that PHH itself would become personally bound by the mortgage. Instead, she alleges that PHH performed servicing functions associated with the mortgage and exercised authority delegated to it concerning lender-placed insurance. That is an allegation of the performance of delegated duties, not an allegation that PHH personally assumed the underlying contractual obligation.

Pennsylvania law has long distinguished the two. In *Hudock v. Donegal Mutual Insurance Co.*, insurers delegated certain contractual functions to insurance adjusters. 264 A.2d 668, 672 (Pa. 1970). The Pennsylvania Supreme Court held that although the adjusters had a duty to their principals "to perform whatever tasks were assigned to them," that duty "did not serve to create a contractual obligation between the adjusters and appellants." *Id.* Thus, delegation of performance under a contract does not, without more, create contractual privity

between the agent performing the delegated task and the principal's counterparty.

The Third Circuit recently applied the same principle. *See Blecher v. Progressive Cas. Ins. Co.*, No. 25-3546, 2026 WL 2086192, at *2 (3d Cir. July 20, 2026). There, the plaintiffs argued that a nonparty affiliate could be liable for breach because contractual duties had been delegated to it. The Court rejected the argument, explaining that "[e]ven if Progressive Select had delegated duties to Progressive Casualty under the insurance policy, this would not have created a de facto contractual obligation" between the nonparty affiliate and the insureds. *Id.*

The same reasoning applies here. Graham alleges that PHH serviced her loan and, in doing so, exercised the mortgage's force-placement remedy and administered related escrow and insurance functions. But the Court previously held that allegations that "PHH serviced Plaintiff's loan and controlled whether to impose lender-placed insurance and how to apply related charges to escrow" were insufficient to establish contractual liability. *Graham*, 2026 WL 899427, at *12. The Third Amended Complaint adds detail concerning how PHH performed those functions, but it does not add the critical allegation missing before: that PHH agreed, expressly or by conduct manifesting an intent to be personally bound, to assume liability under Graham's mortgage.

Graham therefore alleges, at most, that contractual functions were delegated to PHH and that PHH performed them. Under Pennsylvania law, that is not enough to create contractual privity. And unlike *Bennett*, the Third Amended Complaint contains no allegation that PHH independently guaranteed performance or otherwise voluntarily undertook personal contractual responsibility to Graham.

Because the Third Amended Complaint still does not plausibly allege that PHH was a party to the mortgage or assumed personal liability for its obligations, Graham again fails to state

a breach of contract claim against PHH.

An appropriate order follows.[6]

**BY THE COURT:**

**S/ WENDY BEETLESTONE**

**WENDY BEETLESTONE, C.J.**

[6] Although leave to amend ordinarily should be freely given, a court may deny further amendment where the plaintiff has repeatedly failed to cure deficiencies identified in prior pleadings. *U.S. ex rel. Schumann v. AstraZeneca Pharms. L.P.*, 769 F.3d 837, 849 (3d Cir. 2014) ("[A] district court has discretion to deny a plaintiff leave to amend where the plaintiff was put on notice as to the deficiencies in his complaint, but chose not to resolve them."); *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993) ("Repeated failures to cure the [complaint's] deficiency by amendments previously allowed" may justify dismissal with prejudice); *see also Gasoline Sales, Inc. v. Aero Oil Co.*, 39 F.3d 70, 73-4 (3d Cir. 1994) ("[T]hree attempts at a proper pleading is enough[.]"). *See also Valentin v. Dep't of Labor & Indus.*, 2025 WL 830441 (3d Cir. Mar. 17, 2025), *cert. denied*, 2025 WL 3507032 (U.S. Dec. 8, 2025) (affirming dismissal with prejudice where, after a motion to dismiss, *pro se* plaintiff "had the opportunity to address the pleading deficiencies in his amended complaint, and that any further amendment would be futile."). Here, Graham has now pleaded her claims through three amended complaints, and, critically, the Third Amended Complaint was filed after the Court specifically identified the deficiencies in her prior pleading and afforded her an opportunity to cure them. Yet the same deficiencies remain. Under these circumstances, another opportunity to amend is unwarranted. Accordingly, Graham's Section 2605 claim against ASIC, her claim for statutory damages under Section 2605 against PHH, her FCEUA claim against all Defendants, and her breach of contract claim against PHH will be dismissed with prejudice.